IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ROWNEIL A. HORNE, | ) CASE NO. 1:22-CV-00892-BYP |
| Plaintiff, | ) JUDGE BENITA Y. PEARSON<br>) UNITED STATES DISTRICT JUDGE |
| v. | ) |
| COMMISSIONER OF SOCIAL SECURITY, | ) MAGISTRATE JUDGE<br>) JENNIFER DOWDELL<br>) ARMSTRONG |
| Defendant. | ) **REPORT AND RECOMMENDATION** |

## I. INTRODUCTION

Plaintiff Rowneil A. Horne ("Mr. Horne") seeks judicial review of the final decision of the Commissioner of Social Security denying his application for Supplemental Security Income Benefits ("SSI"). This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). (*See* ECF non-document entry dated September 2, 2022). For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's decision.

## II. PROCEDURAL HISTORY

On February 25, 2019, Mr. Horne filed his application for SSI. (Tr. 282). Mr. Horne listed the following physical and mental conditions that limited his ability to work: (1) he was shot in the arm; and (2) head injury. (Tr. 334).

The Social Security Administration ("SSA") denied Mr. Horne's application initially and upon reconsideration. (Tr. 88, 109). Mr. Horne requested a hearing before an administrative law judge ("ALJ"). (Tr. 114). The ALJ held an initial hearing on March 1,

2020. (Tr. 62). Mr. Horne did not appear at that hearing, but the ALJ heard testimony from an independent vocational expert ("VE"). *Id*. After the hearing, the ALJ issued a show cause order to Mr. Horne requiring him to explain in writing why he failed to appear. (Tr. 168). The ALJ held a second hearing on October 1, 2020, at which Mr. Horne again failed to appear, and at which a VE again testified. (Tr. 50). After the second hearing, the ALJ issued another show cause order. (Tr. 217).

The ALJ held a third hearing on March 10, 2021, at which Mr. Horne was represented by counsel. (Tr. 32). Mr. Horne testified at the hearing. On April 26, 2021, the ALJ issued a written decision finding that Mr. Horne is not disabled. (Tr. 12). The ALJ's decision became final on March 28, 2022, when the Appeals Council declined further review. (Tr. 1).

On May 27, 2022, Mr. Horne filed his Complaint, challenging the Commissioner's final decision that Mr. Horne was not disabled. (ECF Doc. No. 1.) Mr. Horne asserts the following assignment of error:

(1) The ALJ's mental RFC determination is the product of legal error and unsupported by substantial evidence where she failed to properly evaluate the previously disabling opinion of Dr. House and crafted an RFC out of whole cloth.

(ECF Doc. No. 12, PageID # 659).

### III. BACKGROUND

#### A. Personal, Educational, and Vocational Experience

Mr. Horne was born in 1984 and was 35 on the date of his application. (Tr. 282). Mr. Horne completed the eighth grade. (Tr. 335). He has never been married. (Tr. 282). In the last 15 years, Mr. Horne has experience performing manual labor at a factory and wrapping meat at a grocery store. (Tr. 335).

### B. Relevant Hearing Testimony

#### 1. Mr. Horne's Testimony

Mr. Horne testified that he only completed the ninth grade and does not know how to read and write. (Tr. 39). He can do basic addition but does not know how to do multiplication tables. (Tr. 45-46). Mr. Horne testified that he has had learning disabilities his whole life and was in special education classes in school. (Tr. 40). He also testified that his mother and grandmother assist with taking care of his children and paying his cell phone bill because he cannot perform those tasks himself. *Id*. Mr. Horne also testified that he has never had a driver's license because he kept failing the test. (Tr. 41). Mr. Horne testified that he was receiving treatment for posttraumatic stress disorder, depression, and a panic disorder. (Tr. 44). Mr. Horne also testified that he is on Ritalin but that it makes him sleep all the time, which he dislikes. (Tr. 43, 45).

#### 2. Vocational Expert's Testimony

At the March 12, 2020 hearing, the ALJ asked the VE to consider a hypothetical individual with Mr. Horne's age, education, and prior work experience who could perform a full range of exertional work; perform simple, routine tasks consistent with unskilled work; could not handle fast-paced work or high-production quotas; could only handle infrequent changes explained in advance; could have only superficial interactions with others and no direct work with the general public; and could only perform low-stress work without arbitration, negotiation, responsibility for the safety of others, or supervisory responsibility. (Tr. 69). The VE testified that work existed in significant numbers in the national economy for the hypothetical individual, including work as a hospital cleaner, cleaner, and laundry worker. *Id*. The ALJ then asked if the hypothetical individual could perform those jobs if the

individual would be off-task approximately 20% of the time. (Tr. 70). The VE testified that limitation would be work-preclusive. *Id*.

At the October 1, 2020 hearing, the ALJ asked the VE to consider a hypothetical individual with the same limitations she had proposed at the first hearing. (Tr. 58-59). The VE testified that the hypothetical individual could perform work as a cleaner, groundskeeper, or dishwasher. (Tr. 58). The VE also testified that no jobs would be available for the hypothetical individual if the hypothetical individual would be off-task approximately 20% of the workday. (Tr. 59).

### C. Relevant Opinion Evidence[1]

#### 1. *David V. House, Ph.D.*

On November 19, 2010, Dr. House completed a psychological evaluation of Mr. Horne in connection with a prior disability claim. (Tr. 412). Dr. House stated that Mr. Horne was a "poor historian" regarding his own background. (Tr. 413). Dr. House opined that Mr. Horne was subdued and quiet in manner. (Tr. 414). Dr. House also stated that Mr. Horne's speech was "marked to a significant degree by poverty of content" but understandable. *Id*. Dr. House further opined that Mr. Horne's thinking was fragmented and that he was significantly limited intellectually. (Tr. 415). Mr. Horne's concentration and attention were markedly limited, his pace was very slow, his persistence was somewhat poor, and he had difficulty completing tasks during the examination. (Tr. 416). Dr. House stated that Mr. Horne could not complete serial sevens or serial threes and could not remember three objects after five minutes. *Id*. Dr. House also opined that Mr. Horne's insight into his current situation

---

[1] At the administrative level, Mr. Horne alleged both physical and mental impairments. In this proceeding, Mr. Horne challenges only the ALJ's determination with respect to his mental impairments. Accordingly, I summarize only evidence regarding Mr. Horne's mental impairments.

4

was markedly limited, as was his overall judgment. *Id*.

Dr. House administered the Wechsler Adult Intelligence Scale-IV to Mr. Horne. (Tr. 417). Mr. Horne's full scale composite IQ was 40, which Dr. House opined placed Mr. Horne in the moderately mentally retarded range of adult intellectual functioning. *Id*. Dr. House also attempted to administer the Wechsler Memory Scale-IV, but Mr. Horne was unable to remember any of the items. (Tr. 418).

Dr. House opined that Mr. Horne had significant difficulties in all areas of functioning and appeared academically to be mentally retarded. (Tr. 417). Dr. House stated that he had "some difficulty" believing that Mr. Horne was as limited as his test results indicated but opined that Mr. Horne did present as "significantly limited" and that other parts of his presentation were consistent with that level of functioning. *Id*. Dr. House also opined that Mr. Horne appeared incapable of self-care on a regular basis. *Id*.

Dr. House diagnosed Mr. Horne with posttraumatic stress disorder, panic disorder with agoraphobia, polysubstance abuse in reported remission, and moderate mental retardation. (Tr. 419). Dr. House opined that Mr. Horne is "of extreme limitation." (Tr. 418). He also opined that Mr. Horne had marked limitations in maintaining attention, concentration, persistence, and pace; understanding, remembering, and following instructions; withstanding the stress and pressure associated with day-to-day work; and relating to fellow workers and supervisors. (Tr. 419). Dr. House also opined that Mr. Horne's level of adaptability and insight into his current situation were markedly limited. *Id*.

The ALJ found that Dr. House's opinions from 2010 were not persuasive because they were outside the relevant time period and remote in time. (Tr. 23). The ALJ also found that subsequent records and evidence were more relevant and supportive of Mr. Horne's RFC. *Id*.

5

### 2. *Michael Faust, Ph.D.*

On February 15, 2017, the Ohio Division of Disability Determination referred Mr. Horne to Dr. Faust for a psychological evaluation. (Tr. 513). Dr. Faust noted that Mr. Horne had previously received benefits, but that those benefits had been terminated when he was incarcerated in 2011. *Id*. Dr. Faust opined that Mr. Horne was tired throughout the evaluation, put forth variable effort throughout testing, and gave up easily on tasks with a low tolerance for frustration. (Tr. 515). Dr. Faust also opined that Mr. Horne appeared depressed and was very passive and lacking in emotion. (Tr. 515-16). Mr. Horne had no difficulty understanding very simple questions but had difficulty with complex instructions. *Id*. He exhibited fairly simplistic speech patterns, had a slower rate of speech and rate of responding, and presented with concrete thought processes. *Id*.

Dr. Faust stated that Mr. Horne knew the date, his date of birth, and his age, but did not know the current President of the United States. (Tr. 516). Dr. Faust also stated that Mr. Horne "minimally" understood the purpose of the exam. *Id*. Mr. Horne was able to complete the general information form independently, but his written responses were barely legible with many words misspelled and many items left blank. *Id*. Mr. Horne was also able to complete simple math word problems in his head but counted on his fingers and could not complete serial sevens or threes without error. *Id*. He recalled zero of three words after a five-minute delay and his abstract thinking was "very concrete." *Id*. Dr. Faust opined that Mr. Horne's responses were consistent with an intellectual disability. *Id*.

Dr. Faust administered the Wechsler Adult Intelligence Scale – IV to Mr. Horne. (Tr. 517). Mr. Horne tested as having a full-scale IQ of 40. *Id*. There was no significant difference between Mr. Horne's index scores in various categories, and all were within the extremely

6

low range. *Id*. Dr. Faust noted that Mr. Horne tested with the "extremely low" range of intellectual ability but opined that Mr. Horne's performance was lower than expected due to a low tolerance for frustration and a tendency to give up on tasks he viewed as difficult. *Id*.

Dr. Faust diagnosed Mr. Horne with major depressive disorder, recurrent, severe without psychotic features; posttraumatic stress disorder; and intellectual disability, mild. (Tr. 517-18). Dr. Faust opined that, while he "strongly believe[d] a diagnosis of intellectual disability, mild is indicated," Mr. Horne tended to be "very withdrawn and depressed, leading to deteriorated performance beyond the extent of his intellectual limitations." (Tr. 518). Dr. Faust opined that Mr. Horne had limitations in his ability to understand, follow, and remember written instructions and verbal instructions beyond very simple instructions; maintain attention and concentration, persistence, and pace; respond to supervision and coworkers in a work setting; and respond appropriately to work pressures. (Tr. 518-19).

The ALJ found Dr. Faust's opinions "somewhat persuasive." (Tr. 22). The ALJ noted that, although Dr. Faust had provided his opinions prior to the relevant period, the exam findings supported diagnoses of posttraumatic stress disorder, major depressive disorder, and mild intellectual disability. (Tr. 22-23). The ALJ found, however, that Dr. Faust's opinions regarding Mr. Horne's limitations were not persuasive because Dr. Faust had stated them in vague terms, noting that Mr. Horne had "limitations" without stating those limitations in "vocationally relevant language." (Tr. 22-23). The ALJ also found that Mr. Horne's testing performance was not fully consistent with prison records from 2012 to 2016. (Tr. 23).

        3.    ***Paul Tangeman, Ph.D. and Kristen Haskins, Psy.D.***

On April 24, 2019, Dr. Tangeman, a state agency medical examiner, opined that Mr. Horne had no medically determinable mental impairments. (Tr. 84). On July 8, 2019, Dr.

7

Haskins, another state agency medical examiner, concurred in Dr. Tangeman's assessment on reconsideration. (Tr. 95). The ALJ found the opinions of the state agency medical examiners to be unpersuasive because the evidence supported a finding that Mr. Horne had medically determinable mental impairments with corresponding non-exertional limits. (Tr. 22).

### D. Relevant Medical Evidence

Various records from 2012 through 2016, when Mr. Horne was incarcerated, noted that Mr. Horne was calm, cooperative, and clean; displayed no signs of trauma or abuse; and was alert and oriented without acute distress. (Tr. 431, 439, 443, 453, 456). Records also indicate that Mr. Horne was not on a mental health caseload and was not in special housing. (Tr. 462, 466, 468, 477). Mr. Horne's intellectual functioning was assessed as average, his memory was intact, and he was alert and oriented. (Tr. 480, 487, 492, 505).

Treatment records from March 11, 2020, while Mr. Horne was incarcerated at Lorain Correctional Institution, similarly indicate that Mr. Horne was not on a mental health caseload. (Tr. 586). Treatment records also state that Mr. Horne displayed no unusual behavior and was clean and groomed in appearance. *Id*.

## IV. THE ALJ'S DECISION

The ALJ first determined that Mr. Horne had not engaged in substantial gainful activity since February 19, 2019, the date of his application. (Tr. 17). The ALJ next determined that Mr. Horne had the following severe impairments: posttraumatic stress disorder; major depressive disorder; panic disorder with agoraphobia; and mild intellectual disability. (Tr. 18). The ALJ determined, however, that none of Mr. Horne's impairments, whether considered singly or in combination, met or medically equaled the severity of one of

the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. *Id*.

The ALJ further determined that Mr. Horne had the residual functional capacity ("RFC") to:

> perform a full range of work at all exertional levels but with the following non-exertional limitations: can perform a full range of exertional work, can perform simple routine tasks (unskilled work); with no fast pace or high production quotas; and with infrequent changes where changes are explained in advance; can have occasional superficial interaction with others (meaning of a short duration for a specific purpose); no direct work with the general public; can perform low stress work, meaning no arbitration, negotiation, responsibility for the safety of others or supervisory responsibility.

(Tr. 19).

The ALJ next determined that Mr. Horne had no past relevant work. (Tr. 24). However, the ALJ determined that, considering Mr. Horne's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Mr. Horne could perform, including cleaner, groundskeeper, and dishwasher. (Tr. 25). Accordingly, the ALJ determined that Mr. Horne was not disabled. (Tr. 26).

V.   **LAW & ANALYSIS**

   A.   <u>**Standard of Review**</u>

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 Fed. Appx. 315, 320 (6th Cir.

2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains sufficien[t] evidence to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (quotation omitted). The standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (quotation omitted).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

**B.    Standard for Disability**

Consideration of disability claims follows a five-step review process. 20 C.F.R. §

416.920. First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. § 416.920(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 416.920(e). An RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1). Agency regulations direct the ALJ to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

"A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL

11

415250. The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support [the ALJ's] decision, especially when that evidence, if accepted, would change [the ALJ's] analysis." *Golden*, 2018 WL 7079506 at *17.

At the fourth step, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. § 416.920(g). *See Abbott*, 905 F.2d at 923.

    **C.**   <u>**Analysis**</u>

Mr. Horne argues that the ALJ committed reversible error in formulating the RFC. In particular, Mr. Horne argues that: (1) the ALJ failed to properly evaluate Dr. House's opinion; and (2) the ALJ erred by formulating an RFC that was not supported by at least one medical opinion. For the reasons set forth below, Mr. Horne's arguments are without merit.

    *1.*   ***The ALJ's Evaluation of Dr. House's Opinion***

The ALJ disregarded Dr. House's opinion because it was outside the relevant time period and remote in time. (Tr. 23). Mr. Horne argues that the ALJ's treatment of Dr. House's opinion was error because the ALJ was required to evaluate the supportability and consistency of Dr. House's opinion, regardless of whether Dr. House issued his opinion after the onset date.

Under the regulations applicable to Mr. Horne's claim, the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 416.920c(a).[2] The SSA considers opinions from medical sources under five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors, such as familiarity with other evidence in the claim or with the disability program's policies and evidentiary requirements. 20 C.F.R. § 416.920c(c). Section 416.920c(b)(1) specifically provides that "it is not administratively feasible for [the ALJ] to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record." 20 C.F.R. § 416.920c(b)(1).

Of the five factors, supportability and consistency are the most important, and an ALJ must explain how the ALJ considered them. 20 C.F.R. § 416.920c(b)(2). The ALJ "may" but "is not required to" explain how the ALJ considered the remaining factors. *Id*. The "supportability" factor looks to how well the medical source supports the opinion with objective medical evidence from the record. *See* 20 C.F.R. § 416.920c(c)(1). The "consistency" factor looks to how consistent the medical opinion is with evidence from other medical and nonmedical sources. *See* 20 C.F.R. § 416.920c(c)(2).

The Commissioner concedes that the ALJ did not analyze the supportability or consistency of Dr. House's opinion. The Commissioner argues, however, that remand is not required because the ALJ properly discounted Dr. House's opinion on the basis that Dr. House

---

[2] Because Mr. Horne filed his disability claim after March 27, 2017, the prior "treating physician" rule, pursuant to which an ALJ was required to give controlling weight to an opinion from a treating physician absent good reason not to, does not apply. *See* 20 C.F.R. § 416.927; *Merrell v. Comm'r of Soc. Sec.*, 1:20-cv-769, 2021 WL 1222667, at *6 (N.D. Ohio Mar. 16, 2021), *report and recommendation adopted*, 2021 WL 1214809.

13

issued it approximately nine years before Mr. Horne's application date and six years before his alleged onset date. The Commissioner disputes that an ALJ is required to evaluate the supportability and consistency of an opinion that is remote in time, and also argues that any error was harmless. I agree.

It is true, as Mr. Horne contends, that the Sixth Circuit has refused to "endorse the position that all evidence or medical records predating the alleged date of the onset of disability, or evidence submitted in support of an earlier proceeding, are necessarily irrelevant or automatically barred from consideration . . . ." *Deboard v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 414 (6th Cir. 2006). It is also true, however, that "[f]ailure to analyze an opinion that predates the alleged onset date is not *per se* reversible error." *Lanthron v. Comm'r of Soc. Sec.*, No. 3:18 CV 0689, 2019 WL 1258785, at *5 (N.D. Ohio Jan. 31, 2019), *report and recommendation adopted*, 2019 WL 5729826. Indeed, the Sixth Circuit has affirmed an ALJ's decision to discount a medical opinion where that opinion predated a plaintiff's onset date and was not consistent with later evidence. *See Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535-36 (6th Cir. 2001) ("Although medical history is relevant to a claimant's condition, Heston's medical history should not be given more weight than that of a doctor observing plaintiff during the relevant period of disability.").

At least one court in this district has held that an opinion's "extreme remoteness" is a basis for an ALJ to discount that opinion when it is inconsistent with other evidence. *See Smith v. Comm'r of Soc. Sec.*, No. 1:20-cv-1366, 2021 WL 3566695, at *13 (N.D. Ohio May 28, 2021) (citing cases); *see also Gore v. Saul*, No. 5:20-cv-341, 2020 WL 9849744 at *13 (N.D. Ohio Dec. 1, 2020), *report and recommendation adopted sub nom*, 2021 WL 3673196 ("the ALJ did address the May 2015 opinion, and his determination that the fact it predated

the alleged onset date limited its analytical value is consistent with both relevant authority and with the undisputed proposition that Gore's visual acuity has changed over time"). There is no question that Dr. House's opinion—which was issued approximately nine years before Mr. Horne's application date and approximately six years before the alleged onset date—qualifies as "extremely remote."

But even if the ALJ should have discussed the supportability and consistency of Dr. House's opinion, the ALJ 's failure to do so constitutes harmless error given the fact that the ALJ analyzed and weighed other medical evidence. *See Lanthron*, 2019 WL 1258785 at *5 (holding that, while ALJ should not have dismissed opinions simply because they predated onset date, error was harmless because ALJ discussed at length evidence of record from within the disability period).

In particular, the ALJ noted that records during Mr. Horne's incarceration from 2012 to 2016 showed that he had average intelligence; presented with a normal mood, affect, and behavior; displayed normal judgment and thought content; was alert and oriented; and was housed in the general population. (Tr. 20). The ALJ also relied on records from a physical exam in February 2017 noting that Mr. Horne was dressed appropriately, maintained good eye contact and appeared oriented, and did not appear to have any significant mental impairment. (Tr. 21). The ALJ further noted that Mr. Horne does not appear to have received mental health treatment while he was incarcerated, and that treatment records from March 2020 do not indicate any mental health problems. *Id*. Moreover, while the ALJ considered Dr. Faust's opinions regarding Mr. Horne's limitations, the ALJ also noted Dr. Faust's statements that Mr. Horne put forth variable effort during testing and that his IQ score was lower than expected due to poor effort. *Id*.

15

The evidence that the ALJ relied on provides substantial support for the ALJ's determination, and I conclude that any error in the ALJ's consideration of Dr. House's opinion was harmless.

### 2. *The ALJ's Formulation of Mr. Horne's RFC*

Mr. Horne also argues that the ALJ committed reversible error because the ALJ formulated Mr. Horne's RFC without basing the RFC on any medical opinion and purportedly substituted her own opinion for that of a medical professional. In support, Mr. Horne relies on *Deskin v. Commissioner of Social Security*, 605 F. Supp. 2d 908 (N.D. Ohio 2008), and its progeny.

In *Deskin*, the court announced a rule that "where the transcript contains only diagnostic evidence and no opinion from a medical source about functional limitations (or only an outdated nonexamining agency opinion), to fulfill the responsibility to develop a complete record, the ALJ must recontact the treating source, order a consultative examination, or have a medical expert testify at the hearing." *Id*. at 912. According to the *Deskin* court, "[w]here the ALJ proceeds to make the residual functional capacity decision in the absence of a medical opinion as to functional capacity from any medical source, or, as here, with one made without the benefit of a review of a substantial amount of the claimant's medical records, there exists cause for concern that such substantial evidence may not exist." *Id*. at 911.

Significantly, however, "*Deskin* has not been universally embraced by courts in this district." *Reidenbach v. Comm'r of Soc. Sec.*, No. 5:21-cv-1880, 2022 WL 3043060, at *8 (N.D. Ohio Aug. 2, 2022). Indeed, one court in this district has stated that *Deskin* "is not representative of the law established by the legislature, and interpreted by the Sixth Circuit Court of Appeals." *Henderson v. Comm'r of Soc. Sec.*, No. 1:08 CV 2080, 2010 WL 750222,

16

at *2 (N.D. Ohio Mar. 2, 2010); *see also Berrier v. Comm'r of Soc. Sec.*, No. 3:20 CV 1655, 2022 WL 189855, at *2 (N.D. Ohio Jan. 21, 2022) ("*Deskin* has since been critiqued by other courts in this District.") Moreover, the Sixth Circuit has held that requiring an ALJ to base the RFC determination on a physician's opinion "'would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled.'" *Rudd*, 531 F. App'x at 728 (quoting SSR 96-5p, 1996 WL 374183 (July 2, 1996)). Mr. Horne appears to concede as much in his reply. (*See* ECF No. 15, PageID # 709) ("Plaintiff and Defendant agree that the ALJ need not base his opinion on any one opinion").

*In Kizys v. Comm'r of Soc. Sec.*, No. 3:10 CV 25, 2011 WL 5024866 (N.D. Ohio Oct. 21, 2011), the *Deskin* court clarified that *Deskin* is "a narrow rule that does not constitute a bright-line test." *Id*. at *2. *Kizys* held that *Deskin* "potentially applies" only where the ALJ "makes a finding of work-related limitations based on no medical source opinion or an outdated source opinion that does not include consideration of a critical body of objective medical evidence." *Id*. Following *Kizys*, courts in this district have recognized that "[w]here an ALJ has opinions that account for the majority of the medical evidence, an ALJ may reasonably make judgments on the supportability and consistency of the medical opinions and can adopt residual functional capacity accordingly." *Phelps v. Comm'r of Soc. Sec. Admin.*, No. 1:21-CV-02295-BYP, 2022 WL 18395824, at *9 (N.D. Ohio Sept. 15, 2022), *report and recommendation adopted*, 2023 WL 316016. Moreover, "an ALJ's RFC determination may be supported by substantial evidence, even if no 'physician offers an opinion consistent with that of the ALJ.'" *Fergus v. Comm'r of Soc. Sec.*, No. 5:20-CV-

17

02612-CEH, 2022 WL 743487, at *9 (N.D. Ohio Mar. 11, 2022) (quoting *Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018)). Indeed, "[t]he Sixth Circuit has repeatedly upheld ALJ decisions where the ALJ rejected medical opinion testimony and determined RFC based on objective medical evidence and non-medical evidence." *Borawski*, 2021 WL 811717 at *18.

Mr. Horne does not argue that the RFC is flawed because there is a critical body of objective medical evidence post-dating the medical source opinions of his treating physicians or the state medical examiners. Instead, Mr. Horne argues only that a medical opinion was necessary to inform the ALJ about Mr. Horne's limitations. Because Mr. Horne has not identified a critical body of medical evidence that Dr. Faust and the state agency medical examiners failed to consider, his argument that the ALJ violated *Deskin* is without merit. *See Adams v. Colvin*, No. 1:14CV2097, 2015 WL 4661512, at *16 (N.D. Ohio Aug. 5, 2015) (holding that ALJ did not err in formulating RFC even though approximately ten months had lapsed between medical opinion and ALJ's decision where plaintiff did not demonstrate that subsequent records changed medical evidence to the extent that medical opinion was outdated); *Berrier*, 2022 WL 189855, at *3 (holding that *Deskin* did not apply where there was "no showing of a 'critical body of objective medical evidence' post-dating the psychologists' opinions that had not been considered by the ALJ"). The ALJ thus did not err in failing to obtain an updated medical opinion and instead formulating Mr. Horne's RFC based on the evidence as a whole.

**VI.     RECOMMENDATION**

Based on the foregoing, I RECOMMEND that the Court AFFIRM the ALJ's decision.

Dated: April 27, 2023                                    *s/ Jennifer Dowdell Armstrong*
                                                        Jennifer Dowdell Armstrong
                                                        U.S. Magistrate Judge

### VII.   NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

**Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.
*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the

report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).